IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
No.: 5:15-CV-0066-FDW

| | | |
|---|---|---|
| MARSHALL LEE BROWN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **LEGAL MEMORANDUM** |
| v. | ) | **SUPPORTING DEFENDANTS'** |
| | ) | **SUMMARY JUDGMENT MOTION** |
| GEORGE T. SOLOMON, *et. al.*, | ) | Rule 56(e), Fed. R. Civ. P. |
| | ) | Local Rule 7.1 |
| Defendants. | ) | |

**NOW COME** Defendants George T. Solomon ("Defendant Solomon"), Betty Brown ("Defendant Brown"), Swindell Edwards ("Defendant Edwards"), Daniel Redding ("Defendant Redding"), Susan White ("Defendant White") and Kenneth Beaver ("Defendant Beaver") (collectively, "Defendants"), through counsel having moved for summary judgment, this memorandum of law supports the motion.

## STATEMENT OF THE CASE

On 27 May 2015 Plaintiff, an inmate in the custody of the North Carolina Department of Public Safety, Division of Adult Correction and Juvenile Justice ("NCDPS"), proceeding *pro se* filed a Complaint against Defendants alleging that up until mid-2014 Jehovah's Witness inmates confined at Alexander Correctional Institution ("Alexander") were provided separate faith services that included classes once a week on Sundays in the Chapel library, a special annual celebration of Christ's death on 14 April 2014, and a religious faith worship service and lecture on 6 April 2014. Plaintiff further alleged that Defendant Redding refused to reinstate the separate services. Plaintiff requested his Complaint that Jehovah's Witness be considered separate and apart from the Christian/Protestant Religions since they do not believe in the holy trinity among other things. [D.E. 1.] Plaintiff asserted these claims under the First Amendment's Free Exercise and

Establishment Clauses, the Fourteenth Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et. seq.*, against the Defendants in their individual and official capacities. [D.E. 1.]

This Court conducted its frivolity review and allowed Plaintiff's RLUIPA and First Amendment claims to proceed as against Defendants. [D.E. 7] On 8 December 2017 Defendants filed a motion to dismiss for insufficient service of process and lack of personal jurisdiction. [D.E. 11.] By an Order filed 16 January2018, this Court granted in part and denied in part Defendants' motion and ordered the Marshal to use reasonable efforts to obtain personal service on Defendants Redding, Edwards, Brown, Solomon, and White. [D.E. 16.]

In Order filed February 2018, this Court granted Defendants' motion and extended the time for them or Answer or otherwise plead until 2 April 2018. [D.E. 27.] Defendants answered Plaintiff's Complaint on 2 April 2018. [D.E. 29.] This Court set deadlines in its 4 April 2018 Pretrial Order and Case Management Plan that dispositive motions be filed no later than 33 August 2018. [D.E. 30.] By an Order filed 7 September 2018, this Court granted in part and denied in part Defendants' motion and extended the time to file dispositive motions until 28 September 2018. [D.E. 33.] By an Order filed 26 September 2018, this Court granted Defendants' motion and extended the time to file dispositive motions until 25 October 2018. [D.E. 35.] By an Order filed 23 October 2018, this Court granted Defendants' motion and extended the time to file dispositive motions until 29 October 2018. [D.E. 37.]

This Memorandum of Law supports the summary judgment motion of Defendants filed herewith. Further, the duly-executed affidavits of Defendant Redding, with attached Exhibits A – F, Defendant Edwards, and Defendant Brown, and Exhibit 1 - *Allen v. South Carolina Dep't of Correction*, C.A. No. 3:10-939-HMH-JRM, 2012 U.S. Dist. LEXIS 65424, 2012 WL 1655295

2

(D.S.C. May 10, 2012), adopting Report and Recommendation reported at 2012 U.S. Dist. LEXIS 66018, 2012 WL 1655297 (D.S.C. Apr. 24, 2012) are attached to Defendants' Appendix/Index of Exhibits in Support of Motion for Summary Judgment filed contemporaneously with this motion (D.E. 40).

## STATEMENT OF FACTS

Plaintiff's Allegations

Plaintiff's allegations may be summarized as follows:  Plaintiff alleged in his Complaint that Defendants alleging that up until mid-2014 Jehovah's Witness inmates confined at Alexander Correctional Institution ("Alexander") were provided separate faith services that included classes once a week on Sundays in the Chapel library, a special annual celebration of Christ's death on 14 April 2014, and a religious faith worship service and lecture on 6 April 2014.  Plaintiff further alleged that Defendant Redding refused to reinstate the separate services.  Plaintiff requested his Complaint that Jehovah's Witness be considered separate and apart from the Christian/Protestant Religions since they do not believe in the holy trinity among other things as well as injunctive, and declaratory relief and compensatory damages.  [D.E. 1.]

Defendants' Summary Judgment Materials

Defendants rely on the pleadings and attachments and the aforementioned affidavits. Defendants' summary judgment materials show that Defendant Brown has been employed with NCDPS (the former North Carolina Department of Correction) in Chaplaincy Services since January 1997 and has been the Director of Chaplaincy Services since April 2003.  (Brown Aff. ¶ 2.)  As the Director of Chaplaincy Services Defendant Brown's duties and responsibilities include formulating and providing professional supervision of chaplaincy services.  She provides guidance and assistance for the religious activities to all the facilities within North Carolina prisons.

3

Annually, countless numbers of worship services, scripture studies, seminars counseling sessions, segregation visits, and special events are conducted by chaplains. Defendant Brown is familiar with multiple religions and coordinate those practices within NCDPS Policy and Procedures. Defendant Brown communicates with religious judicatory leaders, clinical pastoral care supervisors, theological educators, medical providers, attorneys, prison administrators, legislators, volunteers, inmates, and their families. Along with her staff, she is responsible for coordinating recruitment, screening and selection of state-funded, temporary, community-funded, and volunteer chaplains. The Chaplaincy Services Central office staff provide technical support for the facilities' clinical chaplains or other designated staff. (Brown Aff. ¶ 3.)

NCDPS provides written guidance to NCDPS administrators, chaplains, and other appropriate staff concerning religious practices and religious paraphernalia. NCDPS's Religious Practices Resource Guide and Reference Manual ("Manual") written and published by the Division of Prisons Religious Practices Committee includes a list of faith practices that are officially recognized by NCDPS. This Manual also includes a brief description of the basic beliefs, authorized practices, worship procedures, and authorized religious items associated with each faith group. NCDPS recognizes the Christian faith as an approved religion. The part of the Manual under Faith Groups includes a section for the Christian faith that provides guidance on its basic beliefs, authorized practices, and approved religious property. Jehovah's Witness is included as a denomination or sect of the Christian faith. (Redding Aff. ¶ 5, Exhibit B; Brown ¶ 5.) The Manual provides that Sunday is generally observed as the day of worship, study, prayer, and fellowship. Denominational Services are not offered. Jehovah's Witness adherents are encouraged to attend Christian Worship. (Redding Aff. ¶ 6, Exhibit B at Bates-stamped pp. .)

The Manual correctly categorizes Jehovah's Witnesses as a Christian-Protestant sect. Jehovah's Witnesses is a restorationist, chiliastic Christian Protestant religion. Jehovah's Witnesses consider the Bible to be the ultimate authority for their teachings and practices. Protestant Christian believe the Bible to be the Ultimate authority of their teachings and practices. The interpretation of this statement will vary from sects and denominations. (Brown Aff. ¶ 7.)

Charles Taze Russell, or Pastor Russell, was an American Christian restorationist minister from Pittsburgh, Pennsylvania, and founder of what is now known as the Bible Student movement (later named Jehovah's Witnesses) from his experiences as a member of Christian Protestant churches (Presbyterianism and Congregationalism). (Brown Aff. ¶ 8.) The entire Protestant canon of scripture is considered the inspired, correct word of God. The Witnesses accept the Bible as scientifically and historically accurate and reliable, and interpret much of it literally, while also accepting it is abundant in symbolism. The Jehovah's Witnesses produced an edition of the Bible, the New World Translation of the Holy Scriptures, though the identity of the translators has remained anonymous. Jehovah's Witnesses claim to use the Bible as the basis for all their beliefs, although studies of the religion show that the traditional teachings of Russell, as well as the pronouncements of the Governing Body, through Watch Tower publications, carry at least as much weight as the Bible, if not more. The leadership of Jehovah's Witnesses claims to be the single visible channel of Jehovah and asserts that the Bible cannot be understood without its assistance. (Brown Aff. ¶ 9.)

While Plaintiff is correct to state that the Jehovah's Witnesses do not believe in the holy trinity doctrine, in the same manner as some Christian denominations or sects. The Jehovah's Witnesses is a Christian organization with nontraditional beliefs and practices. Each individual prison facility such as Alexander does not have the time nor space to offer a service for every

5

Protestant denomination or sect.  There are other Christian groups that have nontraditional beliefs and practices, such as snake handling and partaking of the blood of Christ that due to this limitation of time and space are provided weekly services through each facilities non-denominational Christian service.  (Brown Aff. ¶ 10.)

The theological similarities (not scholarly) that place the Jehovah Witness within the context of Christendom are as follows:

1. They both believe in God.
2. They both believe is Jesus Christ.
3. They both believe that all will die and meet in the Judgment.
4. They both believe in the Holy Spirit.
5. They both believe that Jesus came from Heaven and when He died He returned to Heaven.
6. The both believe that Jesus gave His life as a ransom sacrifice and it was through His death and His resurrection that made it possible for those who exercise their faith in Him to gain eternal or everlasting life.
7. They both believe in the resurrection of Jesus Christ and the kingdom of God.

(Edwards Aff. ¶ 4.)

NCDPS policies and procedures related to religious services were not promulgated with any intent to discriminate against Plaintiff or the Jehovah Witness denomination.  Specifically, NCDPS Policy and Procedures, Chapter H, Section .0100, Title "Religious Services" provides in Subsection .0106(e) "Authorized Religious Practices,"

(b)    Regular population inmates are allowed to attend any corporate worship service held at the facility.

(e)    Any offender may privately pray, meditate, and study scriptures or religious literature in his or her cell, so long as the offender does not interfere with other offender(s), the offender's assigned program or work assignments, security or operational management.

(Redding Aff. ¶ 7, Exhibit C at pages 5-6 of 7.)  Alexander averages 2,000 offenders that attend a service each month.  In his role as Clinical Chaplain at Alexander Defendant Redding is

6

responsible for creating and maintaining a monthly religious services calendar that establishes a schedule for opportunities for inmates to participate in corporate worship at Alexander. (Redding Aff. ¶ 8, Exhibits D and E.) Alexander has a full list of services offered with very little space for any new services. The Christian Worship schedule has a wide representation of Protestant Denominations in an attempt to minister to the wide range of offender spiritual needs. (Redding Aff. ¶ 9, Exhibit D.)

Alexander's Christian worship services follow the same basic format that includes prayer, singing, and a message. There is only one Chapel at Alexander that is used not only for Christian services, but also for the other faith groups. Alexander does not offer a separate weekly worship service for Jehovah's Witness adherents because the Manual includes Jehovah's Witness as a Protestant denomination. Alexander does not have the time nor space to offer a service for every Protestant denomination. (Redding Aff. ¶ 10.)

Plaintiff was transferred from Tabor Correctional Institution to Alexander on 9 March 2011 and remains confined at Alexander. (Redding Aff. ¶ 4, Exhibit A.) While Plaintiff alleges that up until mid-2014 Jehovah's Witness inmates were provided separate faith services that included classes once a week on Sundays in the Chapel library, a special annual celebration of Christ's death on 14 April 2014 and a religious faith worship service and lecture on 6 April 2014 Defendant Redding's records do not show that Alexander offered Jehovah's Witness adherents a regular meeting time or service during 2014. Defendant Redding keeps personal calendars and record all religious service attendance on the calendars for each service. These calendars from 2014 do not indicate that Alexander had separate weekly Jehovah Witness services in 2014. The April 2014 calendar shows a remembrance of the Lord's Supper for Jehovah Witness on Monday, April 14, 2014 that was allowed because Mr. Fittipaldi asked if he could meet with the inmates during the

7

Easter season. Defendant Redding's records do not show that there was any service on 6 April 2014. Defendant Redding's records do show that there was a meeting for Jehovah Witnesses on Sunday, 24 April 2014. (Redding Aff. ¶ 11, Exhibit F.)

Plaintiff receives a Pastoral visit from a Jehovah Witness visitor once a month. (Redding Aff. ¶ 12.) Defendants have made every reasonable effort to accommodate Plaintiff's requests related to the practice of his faith in compliance with NCDPS's Religious Practices Resource Guide and Reference Manual. (Redding Aff. ¶ 13; Edwards ¶ 5; Brown ¶ 11.)

**ARGUMENT**

I.  STANDARD FOR SUMMARY JUDGMENT.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant has "the initial responsibility of informing the district court of the basis for its motion, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265 (1986). "The burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." *Id*. at 326. In response, the nonmoving party cannot rest on bare pleadings alone, but must use the above listed evidentiary tools to designate specific material facts showing there is a genuine issue for trial. *Id*. at 324. A fact is "material" if its resolution is outcome-determinative under governing law and would prevent the party against whom it is resolved from prevailing. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The task before the trial court when resolving a motion for summary judgment is not to make findings of fact, but to determine whether the evidence presents

8

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id*. at 250-252, 91 L.Ed. 2d at 213-214.

Thus, while the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor, a bare contention that an issue of fact exists is insufficient to create a factual dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Nor is a genuine issue of material fact created by making two conflicting statements of fact. *Id.*; *see also, Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 198 (4th Cir. 1997). A nonmoving party who relies on "mere belief or conjecture, or the allegations and denials contained in his pleadings," cannot avoid summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. at 324. Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP*, 213 F. 3d 175, 180 (4th Cir. 2000). Also, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380; 167 L. Ed. 2d 686 (2007). Furthermore, "the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Fed. Rule Civ. Proc. 56(c). In response to a properly supported motion for summary judgment, where the moving party has carried its burden under Rule 56(c), "the opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

*Matsushita Elec. Industr'l Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-248. In *Anderson, supra*, the Court quoted itself from *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872) stating:

> Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Anderson*, 477 U.S. at 251.

Additionally, a judge is to "view the evidence presented through the prism of the substantive evidentiary burden," or in the present case, preponderance of the evidence. *Id*. at 251-252. The Court proceeded to explain the reasoning behind why a judge should view the evidence through the lens of the required standard:

> This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Id.* A trial judge has an affirmative duty to prevent factually unsupported claims from proceeding to trial. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

In this case, Plaintiff has not and cannot present evidence sufficient to permit reasonable jurors to find in his favor. Accordingly, summary judgment should be granted in the Defendants' favor, dismissing all Plaintiff's claims.

II.     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.

RLUIPA Standards:

RLUIPA provides in pertinent part:

(a) General rule. No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –

> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc-1(a). "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A).

Under RLUIPA, the plaintiff bears the initial burden of proving that a prison policy implicates his religious exercise. *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015). The plaintiff must also prove that the disputed policy substantially burdens his religious exercise. *Id.* Further, "a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation[.]" *Id.* (citing *Burwell v. Hobby Lobby Stores*, 573 U.S., at ___, n. 28, 134

11

S. Ct. 2751, 189 L. Ed. 2d 675, 702). Only once a plaintiff meets his burden, then the burden shifts to the defendant prison to meet a compelling interest standard. *Holt*, 135 S. Ct. at 863. Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" *Couch v. Jabe*, 679 F.3d 197, 201 (4th Cir. 2012) (quoting *Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006)).

In *Holt*, the Supreme Court was confronted with a petitioner who believed that growing a beard was a dictate of his faith and the Arkansas Department of Corrections did not dispute the sincerity of the inmate's beliefs. *Holt*¸ 135 S. Ct. at 862. The Supreme Court also determined that the petitioner in Holt "easily satisfied" his obligation of demonstrating a substantial burden because the challenged policy required the petitioner to shave is beard, and thus "engage in conduct that seriously violates [his] religious beliefs," or to disobey that policy and "face serious disciplinary action." *Id*. The Supreme Court reasoned that "[b]ecause the grooming policy puts petitioner to this choice, it substantially burdens his religious exercise. Indeed, the Department does not argue otherwise." *Id*. These facts are easily distinguishable from the case at hand.

RLUIPA does not define "substantial burden" but the Supreme Court has defined the term in the related context of the Free Exercise clause. According to the Court, a "substantial burden" may be found to exist "where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by

12

religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Board, Indiana Employment Security Division*, 450 U.S. 707, 717-18, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981). Importantly, the burden placed on the religious exercise "must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief which is central to religious doctrine." *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir.1987), *aff'd. sub nom.*, *Hernandez v. Commissioner*, 490 U.S. 680, 109 S. Ct. 2136, 104 L. Ed. 2d 766 (1989).

The Fourth Circuit defines a substantial burden as one which

> put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand.

*Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). However, when assessing whether the prison's practice substantially burden a religious exercise "courts must not judge the significance of the particular belief or practice in question." *Lovelace* at 187 n.2.

> RLUIPA does not, however, preclude inquiry into the sincerity of a prisoner's professed religiosity. The truth of a belief is not open to question; rather, the question is whether the objectors beliefs are truly held.

*Id*. (internal citations, parentheses and quotation marks omitted).

First Amendment Standards:

In a First Amendment, free exercise of religion challenge, the relevant inquiry is whether the actions of prison officials were "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The United States Supreme Court enunciated the factors that form this reasonableness inquiry: (1) whether the governmental objective underlying the

13

regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) what impact accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison, and on the allocation of prison resources; and (4) whether there are ready alternatives to the prison regulation. *Turner*, 482 U.S. at 89-90, *accord O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349-350 (1987).

Overlap of RLUIPA and the First Amendment:

RLUIPA imposes a more searching standard, strict scrutiny, on review of free exercise burdens imposed by prison administrators than does the First Amendment, reasonableness. *Lovelace*, 472 F.3d at 186. However, the initial burden on the inmate is the same under both RLUIPA and the First Amendment, *i.e.*, to show that his right to free exercise of religion has been substantially burdened. *Brown v. Ray*, 695 F.Supp. 2d 292, 300 (W.D. Va. 2010). Hereafter, it is supposed that if Defendants have satisfied the stricter "least restrictive means" analysis of the government's burden under RLUIPA, they have also satisfied the reasonableness test set forth in *Turner*. *Lovelace*, 472 F.3d at 186.

Application to the Instant Case:

The Plaintiff cannot prevail on his claims because Defendants have not imposed a substantial burden upon the Plaintiff's exercise of religion. NCDPS policies and procedures related to religious services were not promulgated with any intent to discriminate against Plaintiff or the Jehovah Witness denomination. Specifically, NCDPS Policy and Procedures, Chapter H, Section .0100, Title "Religious Services" provides in Subsection .0106(e) "Authorized Religious Practices,"

(b)     Regular population inmates are allowed to attend any corporate worship service held at the facility.

(e)     Any offender may privately pray, meditate, and study scriptures or religious literature in his or her cell, so long as the offender does not interfere with other offender(s), the offender's assigned program or work assignments, security or operational management.

(Redding Aff. ¶ 7, Exhibit C at pages 5-6 of 7.)  Alexander averages 2,000 offenders that attend a service each month.  In his role as Clinical Chaplain at Alexander Defendant Redding is responsible for creating and maintaining a monthly religious services calendar that establishes a schedule for opportunities for inmates to participate in corporate worship at Alexander.  (Redding Aff. ¶ 8, Exhibits D and E.)  Alexander has a full list of services offered with very little space for any new services.  The Christian Worship schedule has a wide representation of Protestant Denominations in an attempt to minister to the wide range of offender spiritual needs.  (Redding Aff. ¶ 9, Exhibit D.)

Alexander's Christian worship services follow the same basic format that includes prayer, singing, and a message.  There is only one Chapel at Alexander that is used not only for Christian services, but also for the other faith groups.  Alexander does not have the time nor space to offer a service for every Protestant denomination.  (Redding Aff. ¶ 10.)  Thus, Plaintiff has an unfettered right to associate with other members of the Jehovah's Witness faith and he is provided with ample opportunity to associate for purposes of expressing his religious beliefs.  Plaintiff is ordinarily able to congregate and fellowship with all inmates within the general population and write letters and make telephone calls to other Jehovah's Witnesses.  The plaintiff still retains his ability to associate as a Jehovah Witness, albeit in a restricted manner due to his status as an inmate.  This is not a substantial burden created by the defendants, but is a fact and circumstance of his incarceration. *See Overton v. Bazzetta*, 539 U.S. 126, 131, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003) ("The very

15

object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration").

The Plaintiff claims that NCDPS should provide a separate worship service for the Jehovah's Witness faith because the general Christian service [is open to inmates of other Christian sects] and certain religions, including at one time Jehovah's Witness, have separate services. The Supreme Court has held that various religious groups are not required to have identical treatment. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972). Instead, prison officials must only ensure that each religious group has a reasonable opportunity to exercise its religious beliefs. *Id*. Following this Supreme Court case, the lower courts have found interfaith religious services to be sufficient, as long as there is a reasonable relationship between the service and the tenets of the subsidiary sects. *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) (inmate practicing Pentecostal faith did not establish substantial burden on having to worship during "interfaith" Christian services); *Clifton v. Craig*, 924 F.2d 182, 184 (10th Cir. 1991) (no requirement that Church of Christ services be held separately when there are services for Christians); *Weir v. Nix*, 114 F.3d 817, 820-21 (8th Cir. 1997) (fact that Protestant the minister conducted inclusive Protestant services, which were against inmate's exclusive beliefs, was not enough for the inmate to get a separate service, where the minister's beliefs mirrored the inmate's beliefs in all other respects); *Crosley-El v. Berge*, 896 F.Supp. 885, 889 (E.D. Wis. 1995) (general Muslim service for all Islamic inmates, rather than providing separate Moorish services does not place substantial burden on exercise of Moorish religion); *Allen v. South Carolina Dep't of Correction*, C.A. No. 3:10-939-HMH-JRM, 2012 U.S. Dist. LEXIS 65424, 2012 WL 1655295 (D.S.C. May 10, 2012), adopting Report and Recommendation reported at 2012 U.S. Dist. LEXIS

16

66018, 2012 WL 1655297 (D.S.C. Apr. 24, 2012) (concluding that the generic Al-Islam services provided by the SCDC did not impose a substantial burden on an NOI inmate as required by *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006)) (Attached to Exhibit/Index as Exhibit 1). The rationale for this is that "the large number of religious groups represented in the prison population and such factors as security, staffing, and space" can make separate services for all groups logistically infeasible. *Clifton*, 924 F.2d at 185.

While Plaintiff alleges that up until mid-2014 Jehovah's Witness inmates were provided separate faith services that included classes once a week on Sundays in the Chapel library, a special annual celebration of Christ's death on 14 April 2014 and a religious faith worship service and lecture on 6 April 2014 Defendant Redding's records do not show that Alexander offered Jehovah's Witness adherents a regular meeting time or service during 2014. Defendant Redding keeps personal calendars and record all religious service attendance on the calendars for each service. These calendars from 2014 do not indicate that Alexander had separate weekly Jehovah Witness services in 2014. The April 2014 calendar shows a remembrance of the Lord's Supper for Jehovah Witness on Monday, April 14, 2014 that was allowed because Mr. Fittipaldi asked if he could meet with the inmates during the Easter season. Defendant Redding's records do not show that there was any service on 6 April 2014. Defendant Redding's records do show that there was a meeting for Jehovah Witnesses on Sunday, 24 April 2014. (Redding Aff. ¶ 11, Exhibit F.) Plaintiff regularly receives a Pastoral visit from a Jehovah's Witness visitor once a month. (Redding Aff. ¶ 12.)

There is no evidence that Alexander's current lack of a separate worship service for the Jehovah's Witnesses places a substantial burden on the Plaintiff's religious rights. Instead, it is clear that requiring a separate service for a single person would be a tremendous burden on

17

Alexander. While Plaintiff is correct to state that the Jehovah's Witnesses do not believe in the holy trinity doctrine, in the same manner as some Christian denominations or sects. The Jehovah's Witnesses is a Christian organization with nontraditional beliefs and practices. Each individual prison facility such as Alexander does not have the time nor space to offer a service for every Protestant denomination or sect. There are other Christian groups that have nontraditional beliefs and practices, such as snake handling and partaking of the blood of Christ that due to this limitation of time and space are provided weekly services through each facilities non-denominational Christian service. (Brown Aff. ¶ 10.)

Plaintiff failed to identify how this policy caused him to modify his behavior or violate his beliefs. Further, government action, here, prison policy, which simply places restrictions on religious exercise more difficult but does not pressure the adherent violate his or her religious beliefs or abandon one of the precepts of his religion is not a substantial burden. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007). *See, Dellinger v. Clarke*, 172 F. Supp. 3d 898, 902-03 (W.D. Va. 2016) ("[n]o substantial burden occurs if the government action merely makes the religious exercise more expensive or difficult, but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion."). Based on the foregoing authorities this Court should conclude there is insufficient evidence in the record for a jury to find that the lack of a separate weekly Jehovah's Witness service would interfere with Plaintiff's religious rights.

III.    PLAINTIFF CANNOT RECOVER MONETARY DAMAGES FROM DEFENDANTS IN THEIR OFFICIAL CAPACITY.

Plaintiff claims his First Amendment and RLUIPA rights were violated by Defendants. Section 1983 claims against NCDPS officials and employees in their official capacities are barred by the Eleventh Amendment.  In Lytle v. Griffith, 240 F.3d 404 (4th Cir. 2001), the Court said as follows:

> State officers acting in their official capacity are also entitled to Eleventh Amendment protection, because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989) (citations omitted).

*Id.* at 408; *see also Kentucky v. Graham*, 473 U.S. 159 (1985) (holding that the Eleventh Amendment bars federal damages actions against a state and its entities).  Plaintiff's § 1983 claim against Defendants In their official capacities are treated as a claim against the government entity of which they are an agent – in this case, NCDPS.  *See Graham*, 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is not a suit against the officer personally, for the real party in interest is the entity.").  Thus, Defendants are not "persons" subject to suit for damages in their official capacity under § 1983.  This Court should apply the foregoing authorities and conclude any official capacity claims for monetary damages as against Defendants are barred by the Eleventh Amendment.

IV.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FROM ANY CLAIMS FOR MONETARY DAMAGES.

To the extent that Plaintiff purports to seek compensatory damages from Defendants in their individual capacity, Plaintiff has failed to demonstrate a constitutional violation or to show that Defendants acted intentionally in his deprivation and, therefore, Defendants are entitled to qualified immunity.

Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Qualified immunity protects government officials "where the law is unsettled or murky." *Rogers v. Pendleton*, 249 F.3d 279, 286 (4th Cir.2001). The test is whether the act was clearly forbidden, not whether in hindsight the action was wrongful. *Id*. at 286. A court must first "decide whether a constitutional right would have been violated on the facts alleged" and then, "assuming that the violation of the right is established . . . consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (internal quotations omitted). In resolving the second step, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was lawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The deciding court has discretion to decide which step of the two-prong test to analyze first. *Pearson v. Callahan*, 555 U.S. 223, 242, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

The summary judgment materials, including the affidavits indicate that Defendants were not motivated by some intent to deprive Plaintiff of his ability to worship his faith. Plaintiff cannot demonstrate that Defendants took any action out of some ill-will or animus directed to him. Defendants were only following the policies and procedures set out by NCDPS and were acting neutrally and rationally in carrying out those policies. The undisputed evidence demonstrates that Defendants are entitled to qualified immunity because their individual conduct was objectively reasonable in light of constitutional requirements. Plaintiff must come forward with evidence

20

sufficient to overcome Defendants' showing that their actions were reasonable under the circumstances. No officer or administrative personnel would believe providing non-denominational Christian services that allows all denominations and sects of Christian faith to worship corporately at Alexander due in part to the limits of space and time in the facility would violate Plaintiff's right to free exercise of his religion.

Further, the Fourth Circuit has held that RLUIPA only authorizes injunctive relief against a state official, whether sued in his/her individual or official capacity. *Wall v. Wade*, 741 F.3d 492, 496 n.5 (4th Cir. 2014) ("We note at the forefront that Congress did not authorize damages claims against state officials under RLUIPA. *See Sossamon v. Texas*, [563] U.S. [277, 284-88], 131 S. Ct. 1651, 1658-59, 179 L.Ed.2d 700 (2011) (prohibiting damages claims against state officials in their official capacity); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity). Therefore, the plaintiff's only potential remedies under RLUIPA are equitable.")

Moreover, Plaintiff has not demonstrated any compensable damages for the alleged violation of his first amendment rights aside from possibly asserting emotional distress or mental anguish[1]. "[S]uch injury can be compensated with substantial damages only to the extent that it is 'reasonably quantifiable'; damages should not be based on the 'so-called inherent value of the rights violated.'" *Memphis Community School Dist. v. Stachura*, 477 U. S. 299, 310 (1986). Plaintiff has failed to provide evidence of any injury beyond asserting that lack of the provision of a separate weekly Jehovah's Witness service at Alexander violated his right, thus, he was damaged

---

[1] Under 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, *for mental or emotional injury* suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e) (emphasis added).

by the absence. Plaintiff must come forward with a consensus of cases in this jurisdiction establishing the rule on which he wishes to rely. Plaintiff cannot do so, and for this additional reason his action should be dismissed.

## CONCLUSION

For the above and foregoing reasons, this Court ought to grant Defendants' motion for summary judgment and dismiss this action.

Respectfully submitted, this the 29th day of October, 2018.

**JOSHUA H. STEIN**
**Attorney General**

**<u>s/ Yvonne B. Ricci</u>**
Yvonne B. Ricci
Assistant Attorney General
N.C. State Bar No. 21641
N.C. Department of Justice
Public Safety Section
P. O. Box 629
Raleigh, NC 27602-0629
Tel: 919-716-6540
Facsimile: 919-716-6761
Email: yricci@ncdoj.gov

22

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this day the foregoing **DEFENDANTS' APPENDIX/INDEX OF**

**EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was served on the

following via U.S. Mail, first-class postage prepaid:

    Marshall Lee Brown
    OPUS No. 0050673
    Alexander Correctional Institution
    633 Old Landfill Road
    Taylorsville, NC  28681
    *Pro Se Plaintiff*

This the 29th day of October, 2018.

                    <u>**s/ Yvonne B. Ricci**</u>
                    Assistant Attorney General