# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
### 5:15-cv-66-FDW

| | | |
|---|---|---|
| **MARSHALL LEE BROWN, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **GEORGE T. SOLOMON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 38), Plaintiff's Response, (Doc. No. 42), and Defendants' Reply (Doc. No. 45).

## I.    BACKGROUND

*Pro se* Plaintiff, a North Carolina prisoner incarcerated at the Alexander Correctional Institution, filed this action on April 29, 2015, pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). He named as Defendants: (1) North Carolina Department of Public Safety ("NCDPS") Director George T. Solomon; (2) NCDPS Chaplaincy Services Director Betty Brown; (3) NCDPS Chaplaincy Services Director Swindell Edwards; (4) Alexander C.I. Chaplain Daniel Redding; and (5) Alexander C.I. Superintendent Susan White. (Doc. No. 1).  The Complaint passed initial review, (Doc. No. 7), Defendants were served, (Doc. Nos. 21-24), and Defendants filed an Answer, (Doc. No. 29). The Defendants' Motion for Summary Judgment, (Doc. No. 38), is now pending before the Court.

**(1)    Complaint** (Doc. No. 1)

Plaintiff alleges that Defendants are violating the Constitution and the RLUIPA by

incorrectly categorizing Jehovah's Witness as a Christian-Protestant denomination or sect and by failing to provide separate group worship services for Jehovah's Witness adherents at Alexander C.I.

Plaintiff alleges that group worship service is part of the Jehovah Witness belief and practice. (Doc. No. 1 at 15). Alexander C.I. provided Jehovah's Witness inmates with a separate faith worship services until mid-2014. This included classes once a week on Sundays in the chapel library, a special annual celebration of Christ's death on April 14, 2014, and a religious faith worship service and lecture on April 26, 2014. After permitting Jehovah's Witnesses to worship for years at Alexander C.I., Defendant Redding arbitrarily and indefinitely suspended the Jehovah's Witness worship services. (Doc. No. 1 at 15). On June 30, 2014, a request was made to Redding to reinstate the weekly services but he refused, stating that the NDCPS Religious Resource Guide and Practices Manual ("Manual") categorizes Jehovah's Witnesses as Christian-Protestants who do not have to be granted a separate time, meeting place, or specific services. (Doc. No. 1 at 16-17).

Plaintiff claims that the Manual incorrectly categorizes Jehovah's Witnesses as Christian-Protestant sect. The three recognized categories of Christians in the Manual – Catholics, Protestants, and Eastern Orthodox – share the three common beliefs of God as revealed in Jesus Christ, the Holy Spirit as the third person of the trinity, and salvation through Christ. Jehovah's Witnesses do not believe in the holy trinity doctrine so they should be recognized as a distinct Christian organization with non-traditional beliefs and practices. Jehovah's Witnesses follow the biblical commands that they all speak in agreement, have no division, meet together, and annually celebrate Christ's death. (Doc. No. 1 at 19). The Manual itself recognizes that it is not exhaustive and needs to be reviewed and updated at regular intervals, and that relevant materials from

2

knowledgeable religious authorities should be added to make it more accurate and useable.

Defendant Redding's prior provision of separate religious worship services shows that he is conscious that a doctrinal disparity exists between Jehovah's Witnesses and other Christian denominations. (Doc. No. 1 at 18). Redding refused to reinstate Jehovah's Witness services even though he was in the best position to do so, which shows his intent to discriminate.

On February 23, 2015, an informal letter, DC-572 form, and extensive factual information were sent to Defendant White requesting that she contact the Jehovah's Witness governing body, Watchtower Bible & Tract Society. White did not respond but forwarded the materials to Defendant Redding who, in turn, forwarded them to Defendant Brown. Plaintiff does not know whether it was within White's power to take further action or investigate the matter. (Doc. No. 1 at 21).

On March 23, 2015, a memorandum from Defendant Edwards to Brown stated that the DC-572 form is not to be used for existing religious faith groups. Further, "Jehovah's Witnesses is considered as a Christian-Protestant in the Manual, therefore there is to be no separate services or meeting time just for them, they are being accommodated according to NCDPS policy." (Doc. No. 1 at 20).

Plaintiff alleges that Defendants Brown and Edwards were in a position to recognize the Manual's policy error and its unconstitutional consequences yet they chose to allow discriminatory religious suppression to continue. (Doc. No. 1 at 21). He claims that Defendant Solomon supervises all the named Defendants, which "should keep him aware of the possible legal or Constitutional matters, as well as the Grievance Commission/Resolution Board; and the examiners they appoint." (Doc. No. 1 at 22).

Plaintiff seeks to have the Manual amended to recognize Jehovah's Witnesses as a distinct

Christian organization with non-traditional beliefs and practices, reinstatement of distinct religious worship services once a week, payment of the cost of filing the complaint by Defendants Edwards and Brown as nominal damages due to the emotional and religious stress their actions have caused, and other relief that the Court deems just.

**(2)** **Defendants' Motion for Summary Judgment** (Doc. No. 38)

Defendants argue that they have not violated the Constitution or RLUIPA because they have not imposed a substantial burden on Plaintiff's religious exercise and that Plaintiff cannot recover monetary damages from Defendants in their official or individual capacities pursuant to sovereign and qualified immunity.

As to a substantial burden, Defendants argue that NCDPS policies and procedures regarding religious services were not promulgated with any intent to discriminate against Plaintiff or the Jehovah's Witness denomination. Alexander C.I. does not have the time or space to offer a service for every Protestant denomination. Plaintiff has a right to associate with other members of the Jehovah's Witness faith, except restrictions that exist due to his status as an inmate, and he is provided ample opportunity to express his religious beliefs. Interfaith services provide Plaintiff with a reasonable opportunity to exercise his beliefs; there is no requirement that various religious groups be treated identically. Plaintiff's assertion that Jehovah's Witness adherents were provided separate faith services including classes once a week until mid-2014 is incorrect. There is no evidence that Alexander C.I.'s current lack of a separate worship service for the Jehovah's Witnesses places a substantial burden on Plaintiff's religious rights. Requiring a separate service for a single person would be a tremendous burden on Alexander C.I. While Jehovah's Witnesses do not believe in the holy trinity doctrine in the same manner as some Christian denominations or sects, Jehovah's Witness is a Christian organization with nontraditional beliefs and practices.

Other Christian groups with nontraditional beliefs and practices are not provided weekly services due to limited time and space. Plaintiff failed to identify how this policy caused him to modify his behavior or violate his beliefs. Prison policy does not pressure the adherent to violate his or her religious beliefs or abandon a precept of the religion and is not a substantial burden. There is insufficient evidence for a jury to find that the lack of a separate weekly Jehovah's Witness service would interfere with Plaintiff's religious rights.

Plaintiff cannot recover monetary damages from Defendants in their official capacities due to Eleventh Amendment immunity. Defendants are also entitled to qualified immunity from any claims for monetary damages in their individual capacities. No officer o or administrative personnel would believe that providing non-denominational Christian services that allow all denominations and sects of Christian faith to worship corporately at Alexander due in part to limits of space and time in the facility would violate Plaintiff's free exercise of his religion. Further, RLUIPA only authorizes injunctive relief against a state official. Moreover, Plaintiff has not demonstrated any compensable damages for the alleged violation of his First Amendment rights aside from emotional distress or mental anguish; it is not reasonably quantifiable. Moreover, Plaintiff has not demonstrated any physical injury pursuant to § 1997e.

**(3)** **Plaintiff's Response** (Doc. No. 42)

Plaintiff asserts that, when he asked Defendant Redding's permission to continue religious group worship services once a week, Redding said that the Manual includes Jehovah's Witnesses as a Protestant denomination. Plaintiff informed Redding that Jehovah's Witnesses "denounce all of Christendom as False Religion" and do not adhere to Christianity's trinity doctrine. (Doc. No. 42 at 3). Redding responded that, until the Religious Policy is changed there will be no group worship services for Jehovah's Witnesses and they are encouraged to attend the Protestant services

on Sundays. Plaintiff sought recourse through the Administrative Remedy Procedure and Defendant Redding's statements were confirmed.

Defendant Brown alleges to have communicated with a number of religious theologians and alleges that the Manual includes a brief description of different beliefs. However, "Defendant Brown's admissions of investigating the Jehovah's Witnesses based on predominantly contemporary authorities and the admission that this contributed in writing the Policies considering similarities … and hope the difference lead to ultimately teaching similar ideas…." (Doc. No. 42 at 4). Rather than consulting predominantly contemporary authorities, Defendants should have consulted Watchtower Bible. Information from Watchtower and Plaintiff's personal knowledge create a genuine dispute of material fact. NCDPS policy falsely describes the Jehovah's Witness religion and constitutes discrimination and a substantial burden on Plaintiff's religion.

Summary judgment should be denied because Plaintiff's and Defendants' affidavits contradict each other with regards to Jehovah's Witnesses being a protestant religion.

**(4)**	**Defendants' Reply** (Doc. No. 45)

Defendants argue that Plaintiff cannot show that they violated his right to exercise his religious beliefs. Alexander C.I.'s Christian worship services follow the same basic format that includes prayer, singing, and a message. There is only one chapel at Alexander C.I. that is used for Christian services as well as for the other faith groups. Alexander C.I. does not have the time or space to offer a service for every Christian denomination. Jehovah's Witness is a Christian organization with nontraditional beliefs and practices. Each individual prison does not have the time or space to offer a service for every protestant denomination or sect.

NCDPS Religious Services provides that at least six offenders must regularly attend services to hold a religious corporate service. Plaintiff has not alleged or forecast that there are the

required number of inmates that have expressed an interest or made a request to attend a separate Jehovah's Witness service at Alexander C.I.

With regards to qualified immunity, it is not unreasonable for prisons to limit the number of separate group services due to space and time limitations and has granted prison officials qualified immunity on similar claims. Plaintiff cannot demonstrate that Defendants took actions out of ill will or animus directed at him. They were only following NCDPS practices and procedures and neutrally and reasonably applied those policies.

**(5)** <u>**Evidence**</u>[1]

**(A)** <u>**Plaintiff's Affidavit**</u> (Doc. No. 42 at 10)

Plaintiff states that Jehovah's Witnesses do not believe in the same god as Protestants or Christians, and do not believe in the trinity doctrine. Jehovah's Witness religious stance is that they do not mix with any religion "considering Christendom to be Babylon the Great, Protestant, Catholic and all religion; except Jehovah's Witnesses Watchtower Bible and Tract Society." (Doc. No. 42 at 11). Jehovah's Witnesses believe their religion is the only true religion on earth and that taking part in any other religious belief is apostasy and subjects them to disfellowship.

**(B)** <u>**Defendant Daniel Redding Jr.'s Affidavit**</u> (Doc. No. 40-1)

Defendant Redding has been the Clinical Chaplain at NCDPS since 2004. His duties include ensuring that religious rights and practices of approximately 1,252 inmates are respected.

NCDPS provides written guidance to administrators, chaplains, and other staff concerning religious practices and paraphernalia. The NCDPS Manual includes a list of faith practices officially recognized by NCDPS. It includes a brief description of the basic beliefs, authorized practices, worship procedures, and authorized religious items associated with each faith group.

---

[1] This section is not exhaustive.

Jehovah' Witness is included as a denomination or sect of the Christian faith.

The Manual provides that Sunday is generally observed as the day of worship, study, prayer and fellowship. Denominational services are not offered. Jehovah's Witness adherents are encouraged to attend Christian Worship.

NCDPS policies and procedures related to religious services were not promulgated with any intent to discriminate against Plaintiff or the Jehovah Witness denomination.

An average of 2,000 offenders attend service each month at Alexander C.I. It is Redding's role to create and maintain a monthly religious services calendar that establishes a schedule for opportunities for inmates to participate in corporate worship there. Alexander has a full list of services offered with very little space for new services. The Christian Worship schedule has a wide representation of protestant denominations with an attempt to minister to the wide range of officer spiritual needs. Alexander's Christian worship services follow the same basic format that includes prayer, singing, and a message. There is only one chapel at Alexander and it is used for Christian services as well as other faith groups. Alexander does not offer a separate weekly worship service for Jehovah Witness adherents "because the Manual includes Jehovah's Witness as a Protestant denomination [and] Alexander does not have the time nor space to offer service for every Protestant denomination." (Doc. No. 40-1 at 4).

Plaintiff alleges that, up until mid-2014, Jehovah's Witness inmates were provided separate faith services that included classes once a week on Sundays in the Chapel library, a special annual celebration of Christ's death on 14 April 2014 and a religious faith worship service and lecture on 6 April 2014, however, Reddings records do not show that Alexander offered Jehovah's Witness adherents a regular meeting time or service during 2014. Redding keeps personal calendars and records all religious service attendance on the calendars for each service. The calendars for 2014

do not indicate that Alexander had separate weekly Jehovah Witness services in 2014. The April 2014 calendar shows a remembrance of the Lord's Supper for Jehovah Witness on Monday, April 14, 2014, that was allowed because Mr. Fittipaldi[2] asked if he could meet with the inmates during the Easter season. Redding's records do not show that there was any service on April 6, 2014, or a meeting on Sunday April 24, 2014. However, Plaintiff receives a Pastoral visit from a Jehovah's Witness visitor once a month.

Redding "ha[s] made every reasonable effort to accommodate Plaintiff's requests related to the practice of his faith in compliance with NCDPS's Religious Practices Resource Guide and Reference Manual." (Doc. No. 40-1 at 5). He denies that he violated any rights secured to Plaintiff under the laws of the State of North Carolina or the U.S. Constitution.

**(C)** **OPUS** (Doc. No. 40-1 at 7)

Plaintiff's OPUS printout indicates that Plaintiff was transferred from Tabor C.I. to Alexander on March 9, 2011, and remains at Alexander C.I.

**(D)** **NCDPS Religious Practices Reference Manual** (Doc. No. 40-1)

The NCDPS Manual describes Christianity's Basic Beliefs as follows:

> Christianity is made up of many denominations who view the Bible as the divinely inspired word of God and the guide for belief and practice. Christianity can be divided into three major groups: 1) Protestant, 2) Catholic & 3) Eastern Orthodox. Religious concepts and practices within Protestantism vary greatly from denomination to denomination. However, there are a group of beliefs and practices that are common to all Christian denominations: God as revealed in Jesus Christ; **the Holy Spirit as the third person of the Holy Trinity;** Salvation through Christ. (See Appendix for other denominations and Sects.).

(Doc. No. 40-1 at 10) (emphasis added).

The Manual addresses Authorized Practices and it recognizes with regards to Holy Days

---

[2] Louis Fittipaldi is a Jehovah's Witness volunteer minister. Plaintiff appears to allege that Mr. Fittipaldi was permitted to conduct alternate services for Jehovah Witnesses during 2014. See (Doc. No. 1 at 15-16).

that "Sunday is generally observed as the day of worship, study, prayer, and fellowship. Denominational Services are not offered." (Doc. No. 40-1 at 10).

The Manual includes Jehovah's Witness as a Protestant denomination or sect. (Doc. No. 40-1 at 15). It states that "[i]nmates within these groups are encouraged to attend Christian Worship." (Id.).

**(E)** **NCDPS Policy & Procedures** (Doc. No. 40-1 at 17)

NCDPS Policy & Procedures states with regards to Authorized Religious Practices, that "[r]egular population offenders are allowed to attend any corporate worship service held at the facility." (Doc. No. 40-1 at 21) (Section .0106 (b)). Further, "[a]ny offender may privately pray, meditate, and study scriptures or religious literature in his or her cell, so long as the offender does not interfere with other offender(s), the offender's assigned program or work assignments, security or operational management." (Id.) (Section 0106(e)). With regards to Religious Corporate Services, "[i]f a facility chaplain or community volunteer is not available for a specific minority faith group and at least six (6) offenders regularly attend services then an offender faith helper may be considered to assist with facilitation of a religious service or program. The faith group must be listed in the Religious Practices Manual." (Doc. No. 40-1 at 22) (Section .0107(b)).

**(F)** **Defendant Swindell Edwards' Deposition** (Doc. No. 40-2)

Defendant Edwards has been NCDPS's Regional Chaplain for nine years. The theological similarities that place Jehovah Witness within the context of Christiandom are:

1. They both believe in God.
2. They both believe in Jesus Christ.
3. They both believe that all will die and meet in the Judgment.
4. They both believe in the Holy Spirit.
5. They both believe that Jesus came from Heaven and when He died He returned to Heaven.
6. They both believe that Jesus gave His life as a ransom and sacrifice and it was

through His death and His resurrection that made it possible for those who
exercise their faith in Him to gain eternal or everlasting life.
7. They both believe in the resurrection of Jesus Christ and the kingdom of God.

(Doc. No. 40-2 at 2).

Defendant Edwards made every reasonable effort to accommodate Plaintiff's request related to his faith in compliance with NCDPS's Manual. He denies that in performing his duties, he violated any rights secured to Plaintiff under the laws of the State of North Carolina or the U.S. Constitution.

**(G)**     **Defendant Betty Brown's Deposition** (Doc. No. 40-3)

Defendant Brown has been the NCDPS Director of Chaplaincy Services since 2003. Her duties and responsibilities include formulating and providing professional supervision of chaplaincy services. She provides guidance and assistance for the religious activities to all the facilities within North Carolina prisons.

The NCDPS Manual includes Jehovah's Witness as a denomination or sect of the Christian faith. While not all religions are the same they attempt to answer similar questions about how to live life, communicate with the divine or sacred, and behave in harmony with nature and others. Religions offer similar principles and tools for living. The Manual correctly categorizes Jehovah's Witness as a Christian-Protestant sect. It is a "restorationist, chiliastic Christian Protestant religion," and considers the Bible to be the ultimate authority for their teachings and practices. (Doc. No. 40-3 at 3). Protestant Christians believe the Bible to be the ultimate authority of their teachings and practices, but the interpretation of this statement varies between sects and denominations.

Pastor Charles Taze Russell was an American Christian restorationist minister and founder of the Bible Student movement (later named Jehovah's Witnesses) from his experiences as a

member of Christian Protestant churches (Presbyterianism and Congregationalism). (Doc. No. 40-3 at 3). The entire Protestant canon of scripture is considered the inspired, correct word of God.

Jehovah's Witnesses accept the Bible as scientifically and historically accurate and reliable, and interpret much of it literally, while also accepting it is abundant in symbolism. The Jehovah's Witnesses produced an edition of the Bible, the New World Translation of the Holy Scriptures, though the identity of the translators has remained anonymous. Jehovah's Witnesses claim to use the Bible as the basis for all their beliefs, although studies of the religion show that the traditional teachings of Russell, as well as the pronouncements of the Governing Body, through Watch Tower publications, carry at least as much weight as the Bible, if not more. The leadership of Jehovah's Witnesses claims to be the single visible channel of Jehovah and asserts that the Bible cannot be understood without its assistance. (Doc. No. 40-3 at 3-4).

Defendant Brown admits that "Plaintiff is correct to state that the Jehovah's Witnesses do not believe in the holy trinity doctrine, in the same manner as some Christian denominations or sects." (Doc. No. 40-3 at 4). However:

> The Jehovah's Witnesses is a Christian organization with nontraditional beliefs and practices. Each individual prison facility such as Alexander does not have the time nor space to offer a service for every Protestant denomination or sect. There are other Christian groups that have nontraditional beliefs and practices, such as snake handling and partaking of the blood of Christ that due to this limitation of time and space are provided weekly services through each facilit[y's] non-denominational Christian service.

(Doc. No. 40-3 at 4).

Defendant Brown made every reasonable effort to accommodate Plaintiff's requests related to the practice of his faith in compliance with NCDPS's Religious Practices Resource Guide and Reference Manual. She denies that in performing her duties she violated any rights secured to Plaintiff under the laws of the State of North Carolina or the U.S. Constitution.

## II.    LEGAL STANDARDS

**(1)    <u>Summary Judgment</u>**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  <u>Id.</u> at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  <u>Anderson</u>, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586

(2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

**(2)     <u>First Amendment</u>**

The First Amendment of the Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend I. The First Amendment applies to the states through the Fourteenth Amendment. <u>See</u> <u>Everson v. Bd. of Educ.</u>, 330 U.S. 1, 15 (1947). For government conduct to survive scrutiny under the Establishment Clause, "(1) it must have a secular purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster an excessive government entanglement with religion." <u>Buxton v. Kurtinitis</u>, 862 F.3d 423, 432 (4th Cir. 2017) (citing <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612–13 (1971)); <u>see</u> <u>also</u> <u>Madison v. Riter</u>, 355 F.3d 310, 316 (4th Cir. 2003). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. <u>Hernandez v. Comm'r</u>, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 349 (1987) (quoting <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)). In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. <u>See</u> <u>Turner</u>, 482 U.S. at

14

89-90. Claims brought under the First Amendment are subject to a less demanding standard of proof than claims brought under RLUIPA, with RLUIPA claims requiring "strict scrutiny instead of reasonableness." See Lovelace v. Lee, 472 F.3d 174, 199 n.8 (4th Cir. 2006).

**(3)** **RLUIPA**

RLUIPA provides, in part that no government shall impose a "substantial burden" on the religious exercise of a person residing in or confined to an institution, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005). A plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b); Holt v. Hobbs, 135 S. Ct. 853, 862 (2015). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, [] or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace, 472 F.3d at 187 (quotations, citation, and alterations omitted).

Once the inmate makes a *prima facie* showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental

interest." <u>Ozmint</u>, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." <u>Couch v. Jabe</u>, 679 F.3d 197, 203 (4th Cir. 2012) (quoting <u>Lovelace</u>, 472 F.3d at 198 n.8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." <u>Cutter</u>, 544 U.S. at 723 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" <u>Couch</u>, 679 F.3d at 201 (quoting <u>Lovelace</u>, 472 F.3d at 190).

**(4)** <u>**Sovereign Immunity**</u>

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. <u>Bright v. McClure</u>, 865 F.2d 623, 626 (4th Cir. 1989) (citing <u>McConnell v. Adams</u>, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." <u>Pusey v. City of Youngstown</u>, 11 F.3d 652, 657 (6th Cir.1993). "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. <u>See</u> <u>Almone v. City of Long Beach</u>, 478 F.3d 100, 106 (2d Cir. 2007); <u>see</u> <u>Hutto v. S.C. Retirement Sys.</u>, 773 F.3d 536, 549 (4th Cir. 2014) (State officials

sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(5)**     <u>**Qualified Immunity**</u>

       The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Groh v. Ramirez</u>, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. <u>Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md.</u>, 999 F.2d 780, 784 (4th Cir. 1993) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted). Where the defendant's entitled to immunity turns on a factual dispute, that dispute is resolved by a jury at trial. <u>Id.</u> (citing <u>Turner v. Dammon</u>, 848 F.2d 440 (4th Cir. 1988), *overruled on other grounds,* <u>Johnson v. Jones</u>, 515 U.S. 304 (1995)).

       In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the

17

facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in <u>Saucier</u> is "often appropriate," it is not mandatory. <u>Pearson</u>, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. <u>Id.</u>

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. <u>Thompson v. Commonweath of Va.</u>, 878 F.3d 89, 97 (4th Cir. 2017) (citing <u>Pearson</u>, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 555 U.S. at 231.

In determining whether a right is clearly established, the court must define "the right allegedly violated … at its appropriate level of specificity." <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999). This does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." <u>Amaechi v. West</u>, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." <u>Id.</u> at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

[t]he contours of the right [are] sufficiently clear that a reasonable official would

understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

### III.   DISCUSSION

### (1)   First Amendment & RLUIPA

The First Amendment and RLUIPA both require as a first step that a plaintiff show that his right to freely exercise his religion has been substantially burdened. The next step under RLUIPA is the least restrictive means analysis, whereas the First Amendment only requires a reasonableness test.

Plaintiff alleges that his Jehovah Witness religion is not a Christian sect or denomination because it rejects the holy trinity doctrine, and that Jehovah's Witness requires group worship services as part of its beliefs and practices. He claims that NCDPS has erroneously classified Jehovah's Witness as a Christian faith and that Defendants' refusal to provide separate worship services for Jehovah's Witnesses substantially burdens the practice of his religion. The availability of a general Christian faith group service does not satisfy the Jehovah's Witness group service requirement because the holy trinity is considered by Jehovah's Witnesses as apostasy and would subject Plaintiff to disfellowship. Plaintiff alleges that NCDPS's classification of Jehovah's Witness as a Christian denomination or sect has caused him to choose between attending a group worship service that violates his religion's tenets or abandoning his religion's group services requirement altogether.

Defendants argue that Plaintiff's religious exercise is not being substantially burdened and that the failure to provide separate group worship services is reasonable. Defendants admit that Jehovah's Witnesses do not accept the holy trinity doctrine, (Doc. No. 42 at 4), and that the NCDPS Manual describes Christianity's Basic Beliefs as including "the Holy Spirit as the third person of the Holy Trinity…," (Doc. No. 40-1 at 10). Defendants do not contest Plaintiff's assertion that Jehovah's Witness requires faith group worship service, or a Jehovah's Witness participation in a religion that is not approved by Jehovah's Witness leadership could result in his disfellowship. Defendants nevertheless contend that Jehovah's Witness is correctly classified as a Christian sect and, as such, they are not required to provide separate group worship and that the availability of general Christian group worship is adequate. Defendants note that Plaintiff may practice his religion by associating with other Jehovah's Witness adherents in the general population, corresponding with those of similar belief, and receiving a Pastoral visit once per month.

Defendants argue that there is only one Chapel at Alexander C.I. that is used for all faith groups' services, that Alexander C.I. does not have the time or space to offer a service for every Protestant denomination, and that requiring a separate service for a single person would be a tremendous burden on Alexander C.I.

Construing the Complaint in Plaintiff's favor, he has adequately alleged that his religious practice has been substantially burdened by Defendants' policies and actions. See, e.g., Wilcox v. Brown, 877 F.3d 161 (4th Cir. 2017) (allegation that plaintiff was being deprived of group worship that is a required component of his observation of the sabbath was sufficient to show a substantial burden). Plaintiff has demonstrated that genuine disputes of material fact exist, *i.e.*, whether NCDPS has properly classified Jehovah's Witness as a Christian denomination or sect, and whether Defendants are obligated to provide separate Jehovah's Witness group worship services. Defendants have failed to carry their burden on summary judgment to show that no substantial burden occurred and that their actions satisfy RLUIPA's least restrictive means or the First Amendment's reasonableness standards. Defendants' Motion for Summary Judgment on Plaintiff's First Amendment and RLUIPA claims will therefore be denied.

(2)    **Sovereign Immunity**

Defendants argue that sovereign immunity bars Plaintiff from recovering monetary damages from Defendants in their official capacities. Defendants argue that Plaintiff's claims for monetary damages against Defendants in their official capacities are essentially claims against the State of North Carolina and are thus barred by sovereign immunity. Plaintiff does not appear to contest the immunity issue.

The Court agrees with Defendants that the damages claims against them in their official capacities are barred by sovereign immunity. See generally Will, 491 U.S. at 66; see, e.g.,

Sossamon v. Texas, 563 U.S. 277, 293 (2011) ("We conclude that the States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver."); Rendelman v. Rouse, 569 F.3d 182, 189 n.2 (4th Cir. 2009) ("RLUIPA does not authorize claims for official or individual capacity damages…."). Therefore, Defendants' Motion for Summary Judgment will be granted on Plaintiff's claims for monetary damages against them in their official capacities.

**(3)    Qualified Immunity**

Defendants argue that they are entitled to qualified immunity on Plaintiff's First Amendment individual capacity claims for damages.[3] Defendants argue that they were following NCDPS policies and procedures, they neutrally and rationally in carried out those policies and procedures, and that their individual conduct was objectively reasonable in light of constitutional requirements. They argue that Plaintiff has failed to overcome Defendants' showing that their actions were reasonable under the circumstances and that no officer or administrative personnel would believe that providing nondenominational Christian services that allow all denominations and sects of the Christian faith to worship corporately at Alexander C.I. due, in part, to limits of space and time in the facility would violate Plaintiff's right to freely exercise his religion.

The Court is unable to determine at this time whether a constitutional violation occurred. See Section (1), *supra.* The Court is also unable to determine if Defendants violated a clearly established right. The Free Exercise Clause of the First Amendment provides that prison regulations are permitted to impinge on an inmate's constitutional rights if the regulation is

_____

[3] "RLUIPA does not authorize claims for official or individual capacity damages…." Rendelman, 569 F.3d at 189 n.2.

reasonably related to legitimate penological interests. However, a factual dispute exists with regards to whether Jehovah's Witness should be categorized as a separate non-Christian faith. See Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995) (unlike the determination of whether a right is clearly established, which is a question of law, the determination of what an officer did may require the resolution of dispute factual allegations by the trier of fact; "If a plaintiff has alleged a clearly established right, summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants."); ACLU of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (where "the defendant's entitlement to immunity turns on a factual dispute, that dispute is resolved by the jury at trial."). The record is simply too uncertain to determine whether qualified immunity should apply at this point in the proceedings. Therefore, Defendants' Motion for Summary Judgment will be denied on Plaintiff's First Amendment claims for damages against Defendants in their individual capacities.

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is granted on Plaintiff's claims for damages against Defendants in their official capacities, and on Plaintiff's RLUIPA claims for damages against Defendants in their individual capacities. Defendants' Motion for Summary Judgment is denied in all other respects.

**IT IS, THEREFORE, ORDERED** that:

Defendants' Motion for Summary Judgment (Doc. No. 38) is **GRANTED** as to Plaintiff's claims for damages against Defendants in their official capacities and as to

Plaintiff's claims against Defendants in their individual capacities for damages under RLUIPA. Defendants' Motion for Summary Judgement is **DENIED** in all other respects.

Signed: December 18, 2018

Frank D. Whitney
Chief United States District Judge